# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 12, 2008

## CHRISTOPHER HATCHER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 01-09093, 01-09094, 01-09095      W. Mark Ward, Judge**

_____

**No. W2007-02275-CCA-R3-PC  - Filed January 8, 2009**

_____

The petitioner, Christopher Hatcher, appeals the denial of his petition for post-conviction relief from his convictions for first degree felony murder, attempted first degree murder, and reckless endangerment.  He argues that he received ineffective assistance of trial counsel.  Following our review, we affirm the judgment of the post-conviction court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Christopher Hatcher.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; William L. Gibbons, District Attorney General; and Scot Bearup, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The petitioner was indicted on one count of first degree premeditated murder, one count of first degree felony murder and two counts of attempted first degree murder arising out of the April 2001 shooting of Marcellus Mackey, Randall White,[1] and Anitra Flowers.  Our opinion on direct appeal provides a synopsis of the evidence presented at his June 2003 trial:

> Byron Braxton, a police officer with the Memphis Police Department, testified that at 9:07 p.m. on April 3, 2001, he was called to the Raintree Apartments because a "citizen called in [and] reported they were hearing gunshots being fired

_____

[1]White was also referred to as Randall Moore and "Red" throughout trial and the evidentiary hearing.

inside the complex." The officer said that, when he heard the radio report that someone had been shot, he responded to the call. The officer said that, when he arrived at the apartment, he saw a woman in an Auto Zone uniform and a man who had been shot several times and was "bleeding profusely." The officer said that, after two other officers arrived, he checked the apartment thoroughly and found four or five other people in the back of the apartment. In the bathroom, he found a man and a woman, both of whom had several wounds to their legs, and he found three children in a bedroom "huddled together and crying." On cross-examination, the officer testified that he did not recall the exact time of the shooting, but that it was dark when he got the call. He also stated that there was only one outside light near the downstairs apartment.

Randall ("Red") White testified that, on April 2, 2001, he was living in Raintree Apartments with his girlfriend Anitra Flowers and her three children: Kevin, Knee-Knee (phonetic), and Christina. He said that his building contained approximately eight apartments, four upstairs and four downstairs, and he lived in a downstairs apartment that had a door that opened to a parking lot. White testified that, on the day of the shooting, he took Kevin Flowers to his cousin's house, and then two of his friends, Marcellus Macklin and Athena ("Dana") Cartwright, came over. He said that, at the time of the shooting, Macklin, Cartwright, Anitra Flowers, Knee-Knee, Christina, and himself were present at the apartment. White testified that, immediately prior to the shooting, he and Anitra Flowers were eating fish in the living room and he was drinking a beer, but had only had a couple of sips. He said that he heard a knock at the door and, upon looking out, saw a man that he did not recognize, but thought that he might have seen the man in the apartment complex. White testified that he asked his friend, Macklin, whether he knew the man at the door, and Macklin said that he did not. White said that Macklin, who was getting up anyway, went to the door first, and he "got up right behind him to see who it was at the door."

White testified that he was going to look out the door before opening it, but that Macklin opened the door first. He said that he saw the Defendant coming from the side of the apartment building, and, as soon as Macklin opened the door, the Defendant started shooting toward the door with "some kind of . . . rifle." White said that he saw three men outside the door, but once the shooting started he ran into the living room.

Over the Defendant's objection, White testified that he recognized the Defendant because the Defendant and the Defendant's brother had previously asked to purchase some marijuana from him. White said that he told them that he had some marijuana to sell to them, and the two men "pulled a gun" on him and took the marijuana that he had with him at the time, some money, jewelry, and a pager. White said that, at the time of the robbery, there was another man with him who recognized the Defendant and the Defendant's brother.

White said that the Defendant shot and killed Macklin and also shot both White and Anitra Flowers. White said that, after he ran into the living room, he looked back and saw the Defendant take "one step in[to] the kitchen." He testified that he saw the Defendant first outside the apartment and then again inside the apartment. White said that the two other men who were with the Defendant did not come into the apartment. He said that he was shot in the back, the leg and the buttocks and that he was shot with three different guns, an assault rifle, a .380 caliber handgun, and a .22 caliber handgun. White said that, after the shooting, he went into the children's bedroom to call the police, and he saw that Anitra Flowers was under one bed and the kids under another bed.

White testified that the police showed him multiple photographs on April 10, 2001, and, from those, he was able to identify the Defendant. White stated that, on April 10, 2001, he was still in the hospital and was taking Percocet for pain, but was still able to positively identify the Defendant.

On cross-examination, White testified that, before the shooting, he had been selling drugs out of his apartment for approximately two months. He said that he sold "little dime bags of weed," and he smoked marijuana himself occasionally. White said that, since the shooting, he had moved to Chicago. White testified that he smoked marijuana the morning of the murder and he had a few sips of wine. White admitted that he had previously been convicted of felony theft. He said that, at the time of the murder, it was dark outside, and the Defendant wore a hood, so he could not see the Defendant's hair or his ears. White testified that the whole event occurred quickly and that the shots were fired almost immediately after Macklin opened the door.

Ashanti Pinkins testified that, on the evening of April 3, 2001, she was walking with two friends, Timothy Jackson and Tiffany Brown, when two men, "Chris and Shawn," stopped them. At first, Pinkins could not identify the man that she called "Chris" in the courtroom. She said that she knew Chris and Shawn because she knew their sister, but she had not seen either of the men in about two years. Pinkins testified that, when Chris and Shawn stopped her and her friends, they asked whether she and her friends had seen "Red." Pinkins said that Chris and Shawn were with two or three other people, but she could not identify them because they had ski masks on. She said that everyone in the group was wearing black or blue and it was dark outside. Pinkins explained that, after the men asked if they had seen "Red," Jackson said, "no, Chris, we haven't seen Red," and Chris responded, "how you know my name?" Pinkins recalled that Jackson responded, "I used to go to school with your little sister," and Chris became angry and put "the gun up to Timothy's side," causing Jackson to run away. Pinkins described the gun as a "long black gun with a banana clip." She said that, after Jackson left, Chris was still standing there while Shawn and the other men went running through a field, and Shawn was telling Chris "come on, come on. . . . They okay. They okay, man, they

-3-

straight. We know them," so Chris ran through the field as well. Pinkins testified that the men ran in the direction of "Red's" house.

Pinkins testified that, thereafter, she ran around a nearby building and into her house. She said that she locked her door and then heard "a whole lot" of gunshots and then a police car. Pinkins testified that the day after the incident she was shown a photo array that included the Defendant, and she identified the Defendant's picture as the man who she called Chris. With her memory refreshed, she then identified the Defendant as Chris, and she said that he had changed his appearance in the two years since she had seen him. Pinkins also testified that she identified Shawn Hatcher, the Defendant's brother, in a photo array.

On cross-examination, Pinkins testified that on the photo array sheet she wrote, "this is the man I saw at Red's door shooting," which was not a true statement. She said that she "didn't mean to write that . . . because she didn't see [any]body shoot." Pinkins testified that she did not want to give a statement to police because she was scared, but the police, who had picked her up and brought her to the police station, refused to take her home until she gave a statement. She explained that she told the police that she had not seen the Defendant shooting, but they were "constantly asking me was I sure" and would not take her home, so she wrote the statement on the photo array because she wanted to go home.

Timothy Jackson testified that, at around 9:00 p.m. on April 3, 2001, he was with two friends, Pinkins and Brown, when "Chris and his brother" stopped them and asked them, "where's Red at?" Jackson responded that he did not know Red. Jackson said that Chris then asked him how he knew Chris's name, and Jackson said, "I went to school [with your sister]." Jackson testified that Chris then "put the gun to my side," so Jackson ran away and hid behind a car. Jackson said that, after he ran away, Chris and his brother went the other way. Jackson testified that he could not recognize Chris on the day of trial, but was able to identify his picture after the incident took place. Jackson said that he knew who Chris and his brother were because he had seen them before around the apartment complex. Jackson described the gun that Chris used as "a long gun" and said that Chris and his brother did not have anything covering their faces. He said that there were approximately four other men with Chris and his brother, all of whom were armed and wearing masks. Jackson testified that he was shown a photo array by the police and that he identified the Defendant's picture as that of Chris. He said that he also identified Shawn Hatcher, the Defendant's brother, as the man who was with Chris on the night of the incident.

On cross-examination, Jackson testified that the Defendant was with five people on the night of the shooting and that they all had guns. Jackson said that the Defendant never shot at him and allowed him to leave. He also reiterated that he never saw who did the shooting at the victim's house. Jackson said that he gave his statement to police while he was in a correctional facility.

George Norman testified that he lived at Raintree Apartments and was the groundsman there. He said that, on April 3, 2001, he was closing an apartment and saw approximately five men walking, one of whom he recognized as the Defendant. Norman testified that he saw the Defendant walking towards the victim's home with three or four other men and that one or two of the men were masked. Norman testified that one of the men stopped to talk to a girl, and, after he and the girl talked for a while, the man took out a gun and the girl ran away. He testified that he later heard a lot of shooting, so he called 9-1-1. He said the shooting sounded like "war," and he heard machine guns, a shotgun and a pistol. Norman testified that he gave a statement to police the day after the incident.

On cross-examination, Norman testified that, when he called 9-1-1, he was in his apartment and did not mention the Defendant to the 9-1-1 operator. He said that he knew the Defendant because he had seen him in the apartment complex before. Norman stated that he did not see the Defendant shoot anyone. Norman testified that he could not read, so he did not know what was written in the statement that he gave to police, but police read it to him to make sure that it was accurate. On re-direct examination, the State read Norman's statement to police on April 4, 2001, into the record, and Norman verified that the statement was accurate. Then, Defense counsel asked Norman whether the words used in the statement were Norman's, and Norman responded that he provided the Defendant's description. Defense counsel then asked Norman to describe the Defendant in his own words, and Norman responded, "I can't. I don't know." The following occurred:

Q. [Defense Counsel] Okay. Are you able to see me?

A. [Norman] Yeah.

Q.[Defense Counsel] Okay. You're not able to describe me at all?

A.[Norman] Far. Far.

Q.[Defense Counsel] Sir.

A.[Norman] Some.

Q.[Defense Counsel] Some?

A.[Norman] (No audible response.)

Q.[Defense Counsel] Your description of me is the word some?

A.[Norman] (No audible response.)

Athena Cartwright testified that she was Marcel Mackey's girlfriend at the time of his murder. She said that she had been dating him for approximately seven years. She said that, on April 3, 2001, she went to Randall Moore and Anitra Flowers' apartment after she got off work. She said that Flowers cooked some fish and, thereafter, they heard "some knocks on the door." Cartwright testified that she was in the hallway when the door was opened, and Flowers was on the couch. When Mackey opened the door, all she heard were gunshots. She said that the gunshots lasted for approximately five or ten minutes and that, when they stopped, she went to the kitchen and found Mackey lying under the kitchen table face down. She said that she checked to see if Mackey was breathing and he was not. On cross-examination, Cartwright testified that she could not see who had done the shooting.

Anitra Flowers testified that she had three children, and, on April 3, 2001, she was living at 756 East Rains Apartment Number 1 with her children, Christina, Chanita and Kevin, and with Randall Moore. She said that, during the evening of April 3, 2001, she fried fish for dinner and, after eating, she was sitting in her "front room, listening to the radio and watching TV," when she heard a knock a the door. She said that she leaned forward to see who it was. She said that she did not know the person knocking, and told Moore and Mackey that someone was at the door. She said that Mackey got up first and Moore went behind him to the door. She said that, as soon as the door opened, she "felt like I was in Beirut. Gunshots were coming from two different directions. I was stuck in the middle in this room. I had my children in the house and I was trying to get them not to come out of their room." She said that she "hit the floor" and that was when she realized that she had been shot. Flowers testified that she crawled to where her children were and told them to get under the bed and to stay there. Flowers said that she heard Cartwright screaming that Mackey was dead, and she called 9-1-1. Flowers said that she could only see that the man at the door was "a dark skinned guy and he had on black." On cross-examination, Flowers testified that she did not recall how long this incident lasted and that she did not see who was firing the gun.

Christina Flowers testified that she was Anitra Flowers' daughter, and she was living at the Raintree Apartments on April 3, 2001. She said that, during the evening of April 3, 2001, she was on the phone when she heard a gunshot. She stated that, after she went in the hallway, "[I] looked in the living room I saw someone shooting at my mother and she fell over the couch and I dropped the phone and started crying." Flowers testified that she then went back into the bedroom with her little sister. Flowers said that she saw "Chris" outside her bedroom window walking towards her back door, and she said that he was one of the men shooting a gun at the apartment, but she "heard more than one gun." At trial, Flowers was unable to identify the Defendant as the man she called "Chris," but she did identify him in a photo array, stating, "This looks like Chris and there was a lot of shooting and I saw him shooting the gun." Flowers testified that the first time she saw the Defendant was before April 3, 2001, when he robbed Randall Moore outside of her apartment.

On cross-examination, Christina Flowers testified that she did not see the face of any of the men the night of the shooting. She said that she did not see "Chris" outside of her window because it was dark outside. Flowers said that she did not see "Chris" shoot a gun and that it was not the truth when she told police that she had.

Latoya Brown testified that she was living in Raintree Apartments on April 3, 2001, and was watching television that evening with her cousin and two sisters when she heard gunshots. She said that she went outside and saw four "boys" running and told them to stop shooting. She said that one of the "boys" fired back at her twice. She said that the gun that was fired at her appeared to be a "long gun." Latoya Brown testified that she was unable to identify anyone as the man who shot at her that evening.

Rickey Davison, an officer with the Memphis Police Department, testified that he served as a crime response technician. He said that he was called to the murder scene at Raintree Apartments on April 3, 2001, to investigate the scene. He said that he found a casing for a bullet that was shot out of a gun similar to an AK-47 assault rifle and a projectile from a .22 caliber gun inside the apartment and three shotgun shells outside the apartment. The officer testified that the victim was face down when he arrived, and that, when the victim was turned over, there appeared to be multiple gunshot wounds to his abdomen area.

Kevin Shaver, an officer with the Memphis Police Department, testified that he was called to the murder scene at Raintree Apartments on April 3, 2001, as part of the Crime Response Unit. He said that he made sketches of the crime scene. Shaver also testified that he collected most of the evidence at the scene. On cross-examination, Officer Shaver admitted that none of the evidence he collected directly implicated the Defendant.

Gerald Paige, an officer with the Memphis Police Department, testified that he investigated the crime scene at Raintree Apartments on April 3, 2001. He said that he drew a sketch of the outside of the apartment and itemized each piece of key evidence. On cross-examination, Officer Paige admitted that none of the evidence he collected directly implicated the Defendant in this crime.

Rachael Bowen, a fingerprint technician with the Memphis Police Department, testified as an expert that she is qualified to examine fingerprints to determine whether they match. She testified that the fingerprints of the man pictured in the photo array, which was shown to witnesses shortly after the murder, matched the Defendant's fingerprints. On cross-examination, Bowen testified that there was no fingerprint evidence linking the Defendant to the scene of the crime.

Cornelius Jefferson testified that he knew the Defendant and met him during the evening of April 3, 2001. He said that he was in the Defendant's backyard visiting the Defendant's brother when the Defendant "came up talking about [how]

. . . he had some problems on the other end of the neighborhood." Jefferson explained that the Defendant said that there were threats being made against "the house" and that he was going to stop the threats. Jefferson said that he realized that it was time for him to leave, and the Defendant stopped him with a rifle. He testified that he left the Defendant's house with the Defendant, who had a rifle, the Defendant's brother, and another man, who he did not know but who was armed with a shotgun. Jefferson said that he did not know where they were going, but he knew that guns were going to be involved. He said that, when they left, he was unarmed and the four men walked towards Raintree Apartments to "Red's" apartment. Jefferson said:

> [W]hen we first got there we [were] all pretty much lined up side-by-side. And [the Defendant] sent me and his partner . . . ahead of him. And they ran into some kids. . . . [I]t seemed as if . . . he was about to raise his gun up . . . and he started to [raise it at the kids]. . . . [A]fter we proceeded to move from the kids . . . [the Defendant] made us walk over towards the house. . . . [H]e proceeded to make me knock on the door.

Jefferson testified that, after he knocked on the door, the Defendant pushed Jefferson out of the way and Jefferson ran away to the gas station. He said that he called one of his cousins to come and get him. Jefferson testified that, as he was running, he heard "a lot of shots" being fired. On cross-examination, Jefferson admitted that he was charged with first degree murder as a result of these events and that his attorney arranged, and the State agreed, that he would receive an eight-year sentence for his conviction for first degree murder if he testified against the Defendant. He also conceded that he was told that he could receive probation. Jefferson said that, on the day of the shooting, he smoked marijuana and drank liquor with the Defendant's brother. Jefferson said that he did not go to the police to turn himself in until a week after the incident and came with a lawyer who represented him. On redirect examination, Jefferson said that he had no deals with the State about whether he would receive probation. Jefferson testified that he did not contact police after the shooting because he was scared of the Defendant.

Nathan Berryman, an officer with the Memphis Police Department, testified that he works on the homicide squad. He said that he assisted in the investigation of Marcel Mackey's murder in April of 2001. Officer Berryman testified that he interviewed Pinkins, and he showed her a photo array from which she identified the Defendant as the man she saw shooting at "Red's" door. The officer said that he also interviewed the Defendant as part of his investigation. He said that he read the Defendant his Miranda rights, and the Defendant signed a waiver of those rights. The officer read his notes from the interview into evidence, stating:

> [A]t 4:50 p.m., writer along with Sergeant V. Owens began an interview with [the Defendant], twenty-one years old, date of birth

-8-

1/18/80. [The Defendant] was advised of Rights Form agreeing to talk to us.

[The Defendant] advised that at six a.m. he had gotten up early and went with his mother to look for a car. He said that they went to Reuben's house to MLG & W, and juvenile court to pick up his brother Shawn. He said that they left juvenile court at around 1:30 p.m. and went to two more car lots.

At 3:30 p.m. to 3:45 p.m. he said that his mother and Geraldine dropped him and his brother Shawn off at home, which is 769 Rosebank, and mama and Geraldine went shopping. [The Defendant] said that Shawn cooked him something to eat while he cleaned up the house and watched TV. He said that he watched either Power of Attorney or Texas Justice while he cleaned the house.

Mama and Gerealdine came back home at about 5:30 p.m. with groceries and a lawn mower. [The Defendant] said that he and Shawn helped unload the groceries and lawn mower.

Before 6:30 p.m. [The Defendant] thought Shawn had called Cornelius. And around 6:30 p.m. Cornelius came to his house . . . with his cousins, Terrence and T.J., and another dude that he did not know. Cornelius drove up in a large red four-door Chrysler with nice rims. They all hung around for about an hour and thirty minutes smoking weed. At about 7:30 p.m. to 7:45 p.m. they left and Shawn went with them.

After Shawn, Cornelius and the others had left, [The Defendant] said that around 8:00 p.m. he walked to the Snappy Sacker and bought a beer. He then walked to the Raintree Apartments and sat on the steps in front of Aja's building smoking weed and drinking his beer. While he was sitting on the steps he saw a grey car constantly riding around the Raintree Apartments, playing their music loud and driving around the apartment complex. He said that the grey car had about six guys in the car. [The Defendant] said that the grey car drove around to the back of the apartment complex and parked on the dark side of the parking lot. He said he saw about four to five guys get out of the car with guns, one of the . . . guns was a shotgun. And at least one had a ski mask on.

[The Defendant] said that when he saw them he started walking toward them to see where they were going. While he was walking toward them they approached a boy who was with two girls. They asked the boy if he knew Red, then when the boy said that he

didn't know who Red was, the dude pulled a shotgun on him and the boy ran. [The Defendant] said that because he was standing nearby that people might think that he was with the masked men, however, he denied being involved with any of them.

The men with the guns then went to Red's apartment and he followed them to see what was going on. He then heard several gunshots. After he heard the gunshots he went to the Audubon Park Apartments and just sat around outside. Not long after he got to the Audubon Park his stepmother, Geraldine, called him on his cell phone and he said that somebody had just been killed at the Raintree. His stepmother was crying and she told him to turn himself in even if he didn't do it because the police were looking to shoot to kill.

He got a ride from a female cab driver who was driving her personal car, the female [was] named Robbie. Robbie drove him to a hotel in West Memphis, Arkansas, but he didn't know the name of the hotel at 11:00 a.m. on April 4, 2001. At about 12:00 p.m. his mother and stepmother and girlfriend, Tina, came to pick him up and brought him to the homicide office.

[The Defendant] was asked if he had problems with Red, and he said that it was nothing. [The Defendant] said that about a month ago his cousin Derrick and some other dude had robbed Red, and Red thought that it was him and Shawn. [The Defendant] said that Red had made some threats but he wasn't afraid of him and he didn't have any reason to shoot him.

. . . .

The writer and Sergeant Owens pointed out many inconsistencies in [the Defendant's] story. And [the Defendant] said look, I was trying to cover my brother's ass. He did that shit. In this version of the story he said that Shawn called Cornelius when they picked him up from juvenile court and asked Cornelius to bring some guns over. When Cornelius arrived at the house he was in a red car . . . and then he left and came back in a grey car.

[The Defendant] said that Shawn was mad about Red for threatening his mother, but [the Defendant] didn't want to do anything about it, so he didn't go with them. He only went to watch it go down and saw them go into Red's apartment. When the writer and Sergeant Owens told him that he had been identified by witnesses as being in possession of an SKA assault rifle, he said that he had lied because he was afraid. [The Defendant] said that he knew that his life

-10-

was over because of what he had done. [H]e said that Red had started it. He said that Red was pissed off at him for selling weed in the complex. [The Defendant] said that Red was wearing a ski mask and had robbed him sometime in February. [The Defendant] said that . . . even though the robber was wearing a ski mask, he knew it was Red. And that he and Shawn went back and started making threats toward him.

[The Defendant] asked the writer if the shooting . . . would be considered self-defense because Red made threats to his family. [The Defendant] also wanted to know if Shawn would get the death penalty for being involved in the shooting.

When the writer asked [the Defendant] if he was sorry for killing somebody, he replied, I ain't sorry, he shouldn't had been going to my mama's house with his hands in his pocket like he had a gun. [The Defendant] got mad and said he shouldn't have brought that shit to his mother's house.

Writer asked [the Defendant] about the whereabouts of the assault rifle or any of the other weapons used in the . . . shooting . . . [and the Defendant] said that Cornelius brought the guns with him when he came over to his house and that the SK assault rifle probably had been passed around several times since the shooting. [The Defendant] also said that the rifle was at a house with a lot more guns and that the people in the house would not give up the rifles without a fight. [The Defendant] added that the SK assault rifle that he used was a fully automatic machine gun and that carries federal charges and he didn't want to catch a federal charge. [The Defendant] said that if he told the writer where the assault rifle was it would put his family in grave danger.

The writer asked [the Defendant] if he was a member of a gang and he replied, Red is a G.D. but I'm not in a gang. I hang around the Vice Lords, though. I guess that makes this gang related. . . . [The Defendant] asked . . . how can I be charged with this if you all don't have the murder weapon nor any fingerprints from the gun? [The Defendant] agreed to give a typed statement to the writer and Sergeant Owens.

The officer testified that, after this interview, the Defendant refused to give a statement. On cross-examination, the officer testified that, after he reduced his hand written notes to a typed version, he threw away his hand written notes. He said that his interview with the Defendant was not tape recorded or video taped.

Teresa Campbell, M.D., testified that she performed the autopsy of the victim, Marcel Mackey. Dr. Campbell said that the victim had multiple gunshot wounds to the front and back of his body. According to Dr. Campbell, there was a "graze" wound to the victim's abdomen, which split open the skin, muscle and deep connective tissue over the abdomen, but did not penetrate the abdomen. There was a gunshot wound that entered the lower quads of the abdomen, traveled through the victim and exited his back. There was a third gunshot wound to the right arm and a fourth to the left arm. There was a fifth gunshot wound at the lower neck, which fractured the victim's spine before exiting his back. There was a sixth gunshot wound to the face and a seventh to the right shoulder. There was an eighth gunshot wound to the lower back, a ninth to the lower back, a tenth to where the victim's buttocks met his leg, an eleventh to the top of the left back of the leg, and a twelfth to the right upper leg. On cross-examination, the doctor testified that she could not testify about who did the shooting that caused the victim's injuries.

State v. Christopher Hatcher, No. W2003-01867-CCA-R3-CD, 2004 WL 2058909, at *1-9 (Tenn. Crim. App. Sept. 15, 2004), perm. to appeal denied (Tenn. Jan. 24, 2005).

At the conclusion of the trial, the jury convicted the petitioner of first degree felony murder, second degree murder, attempted first degree murder, and reckless endangerment. The trial court merged the second degree murder conviction into the conviction for first degree felony murder and sentenced the petitioner to life with the possibility of parole for that offense. After a sentencing hearing, the trial court sentenced the petitioner to twenty years for the attempted first degree murder conviction and eleven months, twenty-nine days for the reckless endangerment conviction, to be served concurrently with each other and with the sentence for the first degree felony murder conviction. Following an unsuccessful direct appeal and application for permission to appeal to the Tennessee Supreme Court, the petitioner filed a timely petition for post-conviction relief.

The post-conviction court conducted an evidentiary hearing on September 7, 2007, at which co-counsel testified that he was appointed six or seven weeks before trial to assist lead counsel on the case. Co-counsel said that he and lead counsel reviewed all the discovery received from the State and filed a motion to suppress the photographic identifications of the petitioner. He recalled that they met with the petitioner on "several" occasions before trial. Co-counsel stated that the theory of defense was that the petitioner was not the gunman, and they challenged the "basis of the identifications." Co-counsel said the defense did not call any witnesses because "based on information that we had the only witness that we would have been able to call would have been an alibi witness" and "we concluded . . . there was no credible alibi witness." He recalled that they found out after trial that one of Anitra Flowers' children had identified someone other than the petitioner from a photographic array and stated they "would have possibly called [her] [at] trial" had they known that information. Co-counsel testified that although he started working on the case at a later date, he "[a]bsolutely" felt he was capable of participating in the trial.

On cross-examination, co-counsel testified that they pursued a motion to suppress Mr. White's identification of the petitioner because he was the only witness who "placed a gun being fired in [the petitioner's] hands." Co-counsel stated that the theory the petitioner was not the

-12-

gunman was "the only credible theory that [they] saw." He said he could not have presented a theory of alibi "on a good faith basis." Co-counsel stated he was the petitioner's sole attorney on appeal and thought that the appellate court should have granted the petitioner a new trial based on a Brady violation.

The petitioner stated that Randall White testified at trial as a witness for the State that he saw one of the gunmen "for a split second" and identified that gunman as the petitioner. The petitioner testified that White pointed him out in court and testified that the petitioner had previously robbed him. The petitioner said he requested that his attorneys demonstrate to the jury "that it was impossible [for White] to see [the petitioner] come from the side with a hood on from the side of his house with a rifle" due to the darkness outside, but they did not do so. The petitioner stated he asked his attorneys to take photographs of the nighttime conditions at the apartment complex, however, no photographs were introduced at trial on his behalf.

The petitioner testified that his attorneys failed to "impeach those witnesses that changed their statements." He elaborated that before trial Pinkins said the police would not let her leave until she said she saw the petitioner shooting, but she did not testify to that effect at trial. The petitioner explained that White originally said he could not see who was shooting due to the darkness but "g[o]t on the stand and . . . point[ed] me out because he knew me from a[n] alleged robbery." He said that "George Norman gave a statement but he [does not] know how to read and write, so who wrote it?" The petitioner stated that "[the police] said I gave a statement but they . . . didn't show nothing that was . . . signed or they didn't video tape it." The petitioner stated that his codefendant, Cornelius Jefferson, testified at trial about a man from Texas being present the night of the shooting, but his attorneys "didn't even say [anything] about it."

The petitioner testified that he mentioned a potential female defense witness to his attorneys, but he admitted they could not get in contact with her because he did not know her full name. The petitioner stated that he told the defense investigator that he had called his mother the night of the shooting but his mother was not called to testify. The petitioner said that he wanted to testify at trial, but co-counsel told him, "[D]on't do it because everybody change[d] their statements and you're going to mess up the appeal."

On cross-examination, the petitioner acknowledged that White additionally testified at trial that the petitioner entered his home and was in his kitchen during the shooting, not just outside in the darkness. With regard to his wanting his mother to testify at trial, the petitioner admitted that his mother did not witness the shooting or know where he was at the time of the shooting. The petitioner elaborated that the potential defense witness he mentioned was a female taxi driver named Robbie whom he was with at a hotel in Arkansas on the night of the shooting. The petitioner explained that he had known Robbie for approximately two weeks, having met her at his girlfriend's apartment complex, and had called her on her cell phone the night of the shooting to accompany him to a hotel. According to the petitioner, he and Robbie stayed at the hotel from 5:00 p.m. until approximately 1:00 a.m., and his mother and girlfriend picked him up at the hotel later that day. The petitioner said he gave Robbie's cell phone number to his attorneys and investigator, but the number was unable to be traced. The petitioner admitted he had not heard from Robbie since that night and did not know where she could be found.

The petitioner acknowledged that he was questioned at trial as to his decision not to testify and did not tell the judge that he felt pressured not to testify. With regard to Cornelius Jefferson's testimony about a man from Texas, the petitioner admitted he did not know the man's name, phone number, or address; therefore, it would have been difficult for his attorneys to locate him. He conceded that Ashanti Pinkins was not going to testify at the evidentiary hearing concerning her statement being coerced, and he did not know how to contact Pinkins or George Norman.

The petitioner's lead trial counsel testified that he filed motions for discovery and retained a private investigator service soon after he was appointed to the petitioner's case. He recalled that the investigators interviewed possible witnesses and received statements or supplements from each witness. Lead counsel remembered that the petitioner originally told the police that he was in a taxi on the way to Arkansas at the time of the shooting but "recanted . . . and asked if he was eligible for the death penalty for that sort of offense." Lead counsel stated that the petitioner initially told him and co-counsel the same thing about being in a taxi on the way to Arkansas at the time of the shooting, but after further discussion they realized the "only defense that [they] had was that [the petitioner] was not the shooter." Lead counsel elaborated: "He didn't know what cab company he was on, didn't really remember the cab driver's name, what she looked like. It was evident that [the petitioner] was not candid with us about being on a cab to Arkansas, and I did not want to perpetrate fraud."

Lead counsel testified that their investigation revealed that one of the codefendants, Cornelius Jefferson, "although charged with first degree murder, had a very minimal bond;" therefore, they tried to undermine his testimony as potentially untruthful. The defense also tried to illustrate that the police department "put words in Mr. Norman's mouth" because Norman was "incredibly inarticulate." Asked if he remembered witnesses for the State testifying inconsistently from any prior statements, lead counsel said, "The testimony may have been slightly different but I don't remember . . . a witness' testimony being remarkably different than what we had expected it to be." Lead counsel recalled that the petitioner would often, during trial, become "agitated" and say that a particular witness was lying but would not point out any specific lies. Lead counsel stated that they tried to impeach the witnesses as best as possible, "but a general statement that a witness is lying doesn't really help us that much."

Lead counsel testified that he believed the investigators took photographs of the crime scene and probably did so during the day. He explained, however, that because the shooting occurred inside a "lit" apartment, it did not really make a difference whether it was dark outside. Lead counsel stated that both he and co-counsel took turns questioning the petitioner about aspects of the case to help determine whether he should testify, and the petitioner decided he did not want to testify "after he realized that he would be vigorously cross examined by a seasoned [p]rosecutor."

Lead counsel recalled that in addition to the petitioner, the petitioner's brother, and Jefferson, a person identified as "[the petitioner's] partner from Texas" may have been one of the gunmen. Lead counsel said he did not ask the investigators to try and find "[the petitioner's] partner from Texas" because they did not know his name, his current whereabouts, whether he was from Texas, or whether he was the petitioner's partner. Lead counsel acknowledged that some of the State's witnesses may have testified inconsistently with one another as to the number of gunmen.

On cross-examination, lead counsel testified that they discovered White was a drug dealer through their investigation, not from any information provided by the petitioner. They gained the information, however, strictly from hearsay, not from any particular witness willing to testify from personal experience. Lead counsel recalled that the fact White was a drug dealer came out during the State's direct examination; therefore, the defense was able to address that on cross-examination. Lead counsel reiterated that any inconsistencies between witnesses' testimony and their prior statements were only "minor," or he and co-counsel "would have cross examined that vigorously." Lead counsel testified that he did not remember the petitioner ever asking to have his mother testify at trial.

Following the evidentiary hearing, the post-conviction court entered a detailed written order denying relief. The court concluded with regard to each of the petitioner's allegations of ineffective assistance of counsel that the petitioner failed to establish either deficient performance or prejudice. This appeal followed.

In this matter, the post-conviction court questioned the attorneys regarding the filing of the transcripts of the trial as exhibits to the post-conviction hearing. In returning the records to the trial court clerk, we have ordered that this not be done, primarily because of records being scattered in post-conviction petitions filed separately by petitioners who had been tried jointly. Accordingly, the preferred method is for post-conviction counsel to request the trial record, have copies made, and introduce them as exhibits at the post-conviction hearing. Alternatively, in the case of a very large record, the attorney for the petitioner may file a motion asking that this court take judicial notice of the trial record.

## ANALYSIS

### Standard of Review

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). "When reviewing factual issues, the appellate court will not re-weigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony." Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See Wiley, 183 S.W.3d at 325; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

### Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different"). To satisfy the prejudice requirement of Strickland when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990)).

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton, 945 S.W.2d at 796. As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

On appeal, the petitioner argues that he received ineffective assistance of counsel because counsel failed to "present any evidence about an unidentified individual involved in the shooting" and failed to point out inconsistencies in the testimonies of the witnesses for the State. We will address each issue in turn.

First, the petitioner argues that his attorneys were ineffective for failing to investigate the identity of the man from Texas mentioned by Cornelius Jefferson and discover his role in the shooting. During the defense's cross-examination of Jefferson at trial, the following colloquy took place:

Q. Okay. In the second statement you told them there was a question that you were asked regarding who was shooting –

A. Yes, sir.

Q. -- into the apartment from outside; is that right?

A. Yes, sir.

Q. Okay. Your answer to that was that it was [the petitioner's] partner from Texas that was shooting into the apartment from outside; right?

A. I believe so.

Q. That was your answer?

A. It had to be.

Q. You told the police officers that it was [the petitioner's] partner from Texas, his friend from Texas that was shooting into the apartment from outside?

A. I believe so.

-17-

The petitioner is aggrieved that counsel did not use this testimony to prove that someone other than he "was doing the shooting." He points out that another State witness, Christina Flowers, stated that she saw two people shooting but did not see their faces, yet counsel "never tried . . . to show that [the man from Texas] was in the apartment shooting."

Regarding this issue, the post-conviction court found:

With regard to the one participant in the attack who was known only as [the] man from Texas, there was insufficient information available to locate this witness. Furthermore, the [petitioner] did not (1) produce the witness at the post-conviction hearing, (2) show that trial counsel could have located the witness, and (3) elicit both favorable and material testimony from the witness.

The court also noted that under a theory of criminal responsibility, the petitioner "would be just as guilty regardless of whose bullet killed the victim. The proof indicated that several types of weapons were fired into the apartment justifying an inference that there was likely more than one shooter."

The evidence does not preponderate against the post-conviction court's findings. At the evidentiary hearing, the petitioner admitted that he did not know the name, phone number, or address of the man from Texas and that it would have been difficult, if not impossible, for his attorneys to locate this man. Likewise, lead counsel testified that they did not know the man's name, current whereabouts, whether he was even from Texas, or whether he was the petitioner's partner. We conclude that the petitioner has failed to prove his attorneys performed below an objective standard of reasonableness given that not even he could identify or provide information about the man from Texas. House, 44 S.W.3d at 515. Moreover, as found by the post-conviction court, the petitioner did not produce this person at the evidentiary hearing and has therefore failed to establish prejudice. See Black, 794 S.W.2d at 757.

Second, the petitioner argues that his attorneys were ineffective for failing to "point out" inconsistencies in the testimonies of the witnesses for the State. According to the petitioner, pointing out these inconsistencies would have weakened the witnesses' credibility and the circumstantial evidence against him. He specifically asserts that George Norman testified at trial that he saw five individuals on the way to the apartment the night of the shooting but had said, in a statement given the day after the shooting, that he saw six people. He also asserts that Timothy Jackson and Ashanti Pinkins stated there were five individuals at the apartment that night, which was contrary to codefendant Cornelius Jefferson's testimony that there were four individuals.

Regarding this issue, the post-conviction court noted, "It appears that there [were] some inconsistencies between the witnesses as to the number of culprits involved in the attack. [Lead counsel] characterized any differences as minor. Petitioner introduced no evidence of any other inconsistent statements."

Upon review, we conclude the petitioner has failed to prove that his attorneys performed deficiently or that any alleged deficiencies were prejudicial. The record shows that counsel thoroughly called into question the credibility of the identification witnesses during cross-

examination and closing argument. Counsel specifically attacked the veracity of George Norman's statement to police given the eloquence of the statement and Norman's inarticulateness. Even though counsel may not have attacked the witnesses' credibility with regard to inconsistencies in the exact number of assailants, the petitioner has not shown that counsel's failure to do so was below an objective standard of reasonableness. House, 44 S.W.3d at 515. Moreover, in light of counsel's otherwise thorough examination and argument, the petitioner has not shown a reasonable probability that the outcome of the case would have been different.

The petitioner additionally mentions, in passing, that "if counsel had made it clear that there was conflicting testimony about the type of weapon the [petitioner] had just before the shooting, that would have likely created enough doubt in the minds of the jury that the [petitioner] fired the weapon that killed Marcel Mackey." However, the petitioner failed to address this allegation at the evidentiary hearing or offer any proof in support thereof. He has, therefore, failed to carry his burden with regard to this claim.

## CONCLUSION

We conclude that the petitioner has not met his burden of showing that he received ineffective assistance of counsel. Accordingly, we affirm the denial of his petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE